# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re: VAUGHAN COMPANY, REALTORS,          Case No. 10-10759

        Debtor.

---

JUDITH A. WAGNER, Chapter 11 Trustee
Of the bankruptcy estate of the Vaughan Company,
Realtors,

        Plaintiff,

v.                                         Adv. No. 12-01110

ULTIMA HOMES, INC.,
KENNETH HIGHTOWER, as trustee of the
Ultima Homes, Inc. Defined Benefit Plan and
Trust, JOHN DOE, as trustee of the Ultima Homes,
Inc. Defined Benefit Plan and Trust,

        Defendants.

## MEMORANDUM OPINION

THIS MATTER is before the Court on the Defendants' Motion for Summary Judgment

("Motion for Summary Judgment").[1] *See* Docket Nos. 18, 19, and 23. Plaintiff Judith Wagner,

Chapter 11 Trustee of the bankruptcy estate of the Vaughan Company Realtors (the "Trustee"),

filed a response and a supplemental response in opposition to the Motion for Summary

Judgment. *See* Docket Nos. 16, 20, and 33. This adversary proceeding is one of many adversary

proceedings initiated by the Trustee seeking to recover payments made by Vaughan Company

---

[1] The Defendants originally filed a motion to dismiss the adversary proceeding, in which they asserted facts that were not part of the complaint. *See* Docket Nos. 6 and 7. The Defendants converted the motion to dismiss into a motion for summary judgment but failed to include a statement of undisputed facts. *See* Docket Nos. 18, 19. However, the Defendants' reply in support of their motion for summary judgment included such a statement. *See* Docket No. 23. Because the Trustee had an opportunity to file a sur-reply, *see* Docket No. 33, the Court considered the statement of material undisputed facts set forth in the Defendants' reply. Consequently, when the Court references the "Motion for Summary Judgment," this includes both the motion for summary judgment and the reply (Docket Nos. 18, 19, and 23).

Realtors ("VCR") to parties who invested in VCR's promissory note program.   The Trustee asserts that VCR operated its business as a Ponzi scheme.   She seeks to recover certain transfers made to Defendants under several theories, including avoidance of transfers under the actual fraud and constructive fraud provisions of 11 U.S.C. § 548 and applicable state law.

After consideration of the Motion for Summary Judgment, the responses thereto, and the supporting papers, and being otherwise sufficiently informed, the Court finds that the Motion for Summary Judgment should be granted as to the Trustee's claims for turnover (Count 1) and denied as to all remaining claims.

## SUMMARY JUDGMENT STANDARDS

Summary judgment, governed by Rule 56, Fed.R.Civ.P., will be granted when the movant demonstrates that there is no genuine dispute as to a material fact and that the movant is entitled to judgment as a matter of law.  See Fed.R.Civ.P. 56(a), made applicable to adversary proceedings by Rule 7056, Fed.R.Bankr.P.  "[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and ... [must] demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The party seeking summary judgment must set forth by number all material facts the movant contends are not subject to genuine dispute, and refer with particularity to the portions in the record upon which the movant relies.  NM LBR 7056-1(b).  In considering a motion for summary judgment, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Wolf v. Prudential Ins. Co. of America*, 50 F.3d 793, 796 (10th Cir. 1995) (quoting *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F2d 1238, 1241 (10th Cir. 1990)).

"[A] party opposing a properly supported motion for summary judgment may not rest on mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial" through affidavits or other supporting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed .2d 202 (1986). Furthermore, New Mexico Local Bankruptcy Rule 7056–1(c) provides that the party opposing summary judgment must: 1) list the material facts as to which the party contends a genuine fact exists; 2) "refer with particularity to those portions of the record upon which the opposing party relies;" and 3) "state the number of the movant's fact that is disputed." NM LBR 7056-1(c). Properly supported material facts set forth by the moving party are "deemed admitted unless specifically controverted" by the party opposing summary judgment. NM LBR 7056-1(c).

COUNTS CONTAINED IN THE COMPLAINT

The Complaint contains ninety numbered paragraphs and consists of nine separate counts. Paragraphs 1 through 52 include allegations regarding the nature of the proceeding, jurisdiction and venue, the alleged transfers, and the fraudulent Ponzi scheme allegedly perpetrated by Douglas Vaughan and his company, VCR. Paragraphs 53 through 90 incorporate paragraphs 1 through 52 by reference and set forth each claim as a separate count. The counts are:

| | |
|---|---|
| Count 1 | Turnover and Accounting under 11 U.S.C. § 542 |
| Count 2 | Actual Fraud under 11 U.S.C. § 548(a)(1)(A) based on alleged transfers to the Defendants made within two years of the date of the filing of the VCR bankruptcy case |
| Count 3 | Constructive Fraud under 11 U.S.C. § 548(a)(1)(B) based on alleged transfers to the Defendants made within two years of the date of the filing of the VCR bankruptcy case |

| Count 4 | Actual Fraud under state law, N.M.S.A. § 56-10-18(A)(1) based on alleged transfers to the Defendants made within four years of the date of the filing of the VCR bankruptcy case |
| --- | --- |
| Count 5 | Constructive Fraud under state law, N.M.S.A. § 56-10-18(A)(2) based on alleged transfers to the Defendants made within four years of the date of the filing of the VCR bankruptcy case |
| Count 6 | Fraudulent transfer (present creditors) under state law, N.M.S.A. § 56-10-19(A) and/or 11 U.S.C. § 544 as to the Defendants |
| Count 7 | Fraudulent transfer (past creditors) under state law, N.M.S.A. §56-10-19(B) and/or 11 U.S.C. § 544 as to the Defendants |
| Count 8 | Undiscovered fraudulent transfers based on state law |
| Count 9 | Disallowance of the Defendants' Claims under 11 U.S.C. § 502(d), or, alternatively, Equitable Subordination of her Claims under 11 U.S.C. § 510(c) |

## FACTS NOT SUBJECT TO DISPUTE

The following facts are not subject to genuine dispute:[2]

1.      Ultima Homes, Inc. ("Ultima Homes") maintains a Defined Benefit Pension Plan and Trust (the "Ultima Plan").  *See generally* Defendants' Reply in Support of Motion for Summary Judgment and Memorandum in Support Thereof (Docket No. 23) ("Defendants' Reply"), ¶ 1; Trustee's Sur-Response in Opposition to Defendants' Reply in Support of Motion for Summary Judgment and Memorandum in Support Thereof (Docket No. 33) ("Trustee's Sur-Reply"), p. 6.

2.      Jon K. Hightower is the trustee of the Ultima Plan.  *See* Defendants' Reply, ¶ 3; Trustee's Sur-Reply, p. 7.

---

[2] The Defendants refer to additional facts throughout their briefs.  However, because NM LBR 7056–1(b) requires the movant to include a numbered list of the material facts to which they contend no genuine dispute exists, the Court limited its consideration of facts to those enumerated in the Defendants' statement of uncontested material facts.  *See* Docket No. 23, p. 2-3.  The Court will not consider facts contained in affidavit testimony that are unrelated to the facts set forth in the Defendants' statement of material facts.

3.     Ultima Homes and the Ultima Plan maintain separate bank accounts.[3] *See* Defendants' Reply, ¶ 4; Hightower Affidavit, ¶ 24.  Funds belonging to Ultima Homes were kept separate from funds belonging to the Ultima Plan.[4]  *Id.* at ¶ 10; ¶¶ 24-25

4.     Ultima Homes entered into a contract with Douglas Vaughan in his personal capacity for the construction of Mr. Vaughan's personal residence.  *See* Defendants' Reply, ¶ 11; Trustee's Sur-Reply, p. 8.

5.     Ultima Homes had access to information pertaining to Mr. Vaughan's personal financial situation in 2003 and 2004, including information about loans for which Mr. Vaughan had been approved.  *See* Defendants' Reply, ¶ 12; Trustee's Sur-Reply, p. 8.

6.     From 2004 through 2009, the Ultima Plan invested a total of $100,000 into VCR's promissory note program with a promised rate of return of 16% per annum.  *See* Complaint (Docket No. 1), ¶¶ 31-32; Defendants' Answer to Complaint (Docket No. 5) ("Answer"), ¶ 31-32; Defendants' Reply, ¶¶ 5-7, 13; Trustee's Sur-Reply, p. 7-8.

7.     The investments were evidenced by one or more promissory notes executed by VCR in favor of the Ultima Plan.  *See* Complaint, ¶ 34; Answer, ¶ 34.

8.     VCR made periodic payments to the Ultima Plan in connection with VCR's promissory note program.  *See* Defendants' Reply, ¶ 6; Trustee's Sur-Reply, p. 7.  All such payments were made directly to the Ultima Plan and deposited into a bank account for the Ultima Plan.  *See* Defendants' Reply, ¶ 8; Trustee's Sur-Reply, p. 7; Hightower Affidavit at ¶ 24.

9.     The Ultima Plan received at least $79,342.37 in payments from VCR.  *See* Defendants' Reply, ¶ 13; Trustee's Sur-Reply, p. 8.

---

[3] Defendants also assert it is undisputed that the Ultima Plan is a separate entity from Ultima Homes.  Defendants have not supported his factual assertion with admissible evidence.  However, for the purposes of this opinion, the Court assumes this factual assertion to be true because it does not change the result.
[4] Defendants use the phrase "intermingle," which is a legal conclusion.  The Court instead used the phrase "kept separate," which is consistent with the Defendants' intent.

10.     Ultima Homes did not receive funds from VCR in connection with the note program.  *See* Defendants' Reply, ¶ 9; Trustee's Sur-Reply, p. 8.

## DISCUSSION

The Trustee seeks to recover transfers made by VCR to the Defendants under 11 U.S.C. §§ 544 and 548 and New Mexico's version of the Uniform Fraudulent Transfer Act ("UFTA"). The Trustee consents to the dismissal, without prejudice, of her claim for turnover based on 11 U.S.C. § 542.[5]  Accordingly, the Court will dismiss Count 1.

With respect to the remaining counts, the Defendants contend that they are entitled to judgment in their favor because: (1) the Trustee lacks standing to sue under the Employee Retirement Income Security Act ("ERISA"); (2) the Trustee is prohibited from recovering transfers to the Ultima Plan under ERISA and the Internal Revenue Code ("IRC"); and (3) the Defendants acted in good faith pursuant to N.M.S.A. § 56-10-22(A).  The Defendants also contend that Mr. Hightower and Ultima Homes are not proper parties to the suit because they did not receive any transfers from VCR.  As discussed below, the facts not in genuine dispute are insufficient to demonstrate that the Defendants are entitled to judgment as a matter of law on Counts 2 through 9.

---

[5]Generally, a trustee may not use the turnover provisions of 11 U.S.C. § 542 to recover a fraudulent transfer because the fraudulently transferred property does not become property of the bankruptcy estate until the transfer is avoided and recovered. *See, e.g, In re Amcast Indus. Corp.,* 365 B.R. 91, 122 (Bankr.S.D.Ohio 2007) (recognizing that an action for turnover under § 542 "may be used to compel turnover of estate property whose transfer from the estate has been avoided and ownership is no longer in dispute[,]" but, in order to "state a claim for turnover, the plaintiff must allege that the transfer of funds has already been avoided or that the property is otherwise the undisputed property of the estate.") (citations omitted); *In re Teligent, Inc.,* 307 B.R. 744, 751 (Bankr.S.D.N.Y. 2004) (reasoning that, because fraudulently transferred property does not become property of the estate until the property has been recovered, "[t]he trustee cannot compel the turnover of non-estate property under 11 U.S.C. § 542, and circumvent the more restrictive fraudulent transfer claim in the process.").

*1.  Whether the Trustee has standing to pursue her fraudulent transfer claims*

As an initial matter, the Defendants contend that the Trustee lacks standing to sue the Ultima Plan under ERISA.  They argue that the only persons authorized to sue an ERISA-qualified plan are: (1) a participant or beneficiary; (2) the Secretary of Labor; and (3) a fiduciary of the plan.  Section 502 of ERISA, 29 U.S.C. § 1132(a) enumerates the parties that are entitled to maintain a civil claim under the statute.  That section provides that a civil action may be brought by a participant, a beneficiary, the Secretary of Labor, a fiduciary, an employer, or a person referred to in 29 U.S.C. § 1021 for specified purposes, such as to enforce provisions of an ERISA plan or assert a violation of ERISA.  29 U.S.C. § 1132(a).

The Court cannot determine whether the Ultima Plan is an ERISA-qualified plan in the context of the Motion for Summary Judgment.  The Defendants have failed to establish facts, supported by evidence, which would permit the Court to reach that conclusion.  However, even if the Ultima Plan were ERISA-qualified, Section 502 of ERISA would not prevent the Trustee from pursuing her claims.  It is undisputed that the Trustee is not a participant, beneficiary, fiduciary, or employer associated with the Ultima Plan.  Nevertheless, the Trustee is not seeking to bring an action or enforce any rights *under* ERISA.  Instead, the Trustee is asserting claims for fraudulent transfer under the Bankruptcy Code and the UFTA.  Section 502 of ERISA places limits on a claimant's ability to bring a civil action that seeks certain types of relief.  Since the Trustee is not seeking the type of relief specified in the statute, Section 502 of ERISA is inapplicable to the Trustee's claims.  *See generally Cob Clearinghouse Corp. v. Aetna U.S. Healthcare, Inc.* 362 F.3d 877, 882 (6th Cir. 2004) (plaintiff did not have standing under 29

U.S.C. § 1132(a) to "*maintain an ERISA claim*" because it was not a participant, beneficiary, or fiduciary of an ERISA plan) (emphasis added).[6]

The Court concludes that the Trustee has standing to seek to recover transfers to the Ultima Plan under 11 U.S.C. §§ 544 and 548 and applicable state law.[7]  The Court will deny the Motion for Summary Judgment to the extent that it seeks a determination that ERISA precludes the Trustee from seeking to avoid fraudulent transfers to the Ultima Plan.

### 2.  Whether ERISA's anti-alienation provision bars the Trustee's fraudulent transfer claims

The Defendants contend that Section 206 of ERISA, 29 U.S.C. § 1056(d)(1) and the IRC, 26 U.S.C. § 401(a)(13) prohibit the Trustee from recovering transfers to the Ultima Plan.  As discussed above, it is unclear whether the Ultima Plan is a qualified plan under ERISA. However, even if the Ultima Plan were ERISA qualified, the Court is not persuaded that ERISA's anti-alienation provision bars the Trustee's claims.

ERISA contains a number of provisions directed at safeguarding a stream of income for pensioners and their dependents.  *See generally Guidry v. Sheet Metal Workers Nat. Pension Fund,* 493 U.S. 365, 376, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990).  Section 206 of ERISA, 29 U.S.C. § 1056(d)(1) mandates that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated."  This section is known as the "anti-alienation provision."  The coordinate section of the IRC contains similar restrictions, providing that "[a]

---

[6] *See also Pentech Infusions, Inc. v. Anthem Health Plans of Kentucky, Inc.*, 387 F.Supp.2d 712, 714 (W.D.Ky. 2005) (noting that "only a participant in an ERISA plan or a beneficiary may *enforce rights under such a plan*") (emphasis added); *International Union of Bricklayers and Allied Craftsmen v. Gallante,* 938 F.Supp. 196, 200-201 (S.D.N.Y. 1996) (analyzing whether trustee had standing pursuant to 29 U.S.C. § 1132(a) to assert claims under ERISA); *Cohen v. Independence Blue Cross,* 820 F.Supp.2d 594, 603 (D.N.J. 2011) ("[U]nder ERISA's civil enforcement provision, only participants and beneficiaries have standing to bring a lawsuit.").
[7] The Court confines its ruling on standing to the Defendants' contention that the Trustee lacks standing under Section 502 of ERISA, 29 U.S.C. § 1132(a).

-8-

trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated." 26 U.S.C. § 401(a)(13).

In general, the anti-alienation provision prohibits creditors from reaching funds in an ERISA plan as a means of collecting a judgment against a beneficiary. *Guidry v. Sheet Metal Workers Nat. Pension Fund,* 493 U.S. 365, 372, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990) (ERISA's anti-alienation provision prohibits garnishment of a qualified pension plan "unless some exception to the general statutory ban is applicable.").[8]  The provision has been interpreted to exclude a debtor's interest in pension benefits from the bankruptcy estate. *See Patterson v. Shumate*, 504 U.S. 753, 765, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) (under ERISA's anti-alienation provision, "a debtor's interest in an ERISA-qualified pension plan may be excluded from the property of the bankruptcy estate pursuant to § 541(c)(2)[.]").[9]  A bankruptcy trustee may therefore not access a debtor's interest in an ERISA plan while the funds are being held by the plan. *See In re Kunz,* 2005 WL 165447, *1 (10th Cir. Jan, 26, 2005) (noting that a Chapter 7 trustee may not exercise control over the debtor's interest in a qualified-ERISA plan).

Courts are highly skeptical of creating exceptions to ERISA's anti-alienation provision. *See Patterson*, 504 U.S. at 760 (In construing ERISA's anti-alienation provision, courts have "vigorously ... enforced ERISA's prohibition on the assignment or alienation of pension benefits, declining to recognize any implied exceptions to the broad statutory bar.").  However, creditors or other parties may reach pension benefits if permitted to do so by certain federal statutes.  For example, the IRS is permitted to collect a plan participant's ERISA benefits to satisfy the plan

---

[8] *See also Effect of anti-alienation provisions of [ERISA] on rights of judgment creditors*, 131 A.L.R. Fed. 427 (1996).
[9] *See also In re Reinhart,* 2012 WL 1409284, *5 (10th Cir. Apr. 24, 2012 (discussing the general rule that retirement funds held in ERISA plans are generally not included in the bankruptcy estate); *U.S. I.R.S. v. Synder,* 343 F.3d 1171, 1174 -1177 (9th Cir. 2003) (same).

participant's outstanding tax liabilities. *See* 26 U.S.C. § 6331(a), (c) (the IRS is authorized to levy upon all property belonging to the taxpayer, and no other federal law shall exempt property from the IRS's reach). Courts have also recognized that a creditor may reach a plan participant's ERISA benefits pursuant to a criminal restitution order. *See, e.g., United States v. Irving*, 452 F.3d 110, 126 (2d Cir.2006) ("ERISA pension plans are not exempted from payment of taxes under 26 U.S.C. § 6334, and thus they should not be exempted from payment of criminal fines.").[10]

The Trustee urges the Court to recognize an exception to the anti-alienation provision that would allow her to recover fraudulent transfers under the Bankruptcy Code and applicable state law. The initial inquiry, however, is whether the recovery of a fraudulent transfer constitutes an alienation or assignment prohibited by Section 206 of ERISA and the IRC. The IRC regulations promulgated by the Secretary of Treasury, who has the authority to implement ERISA, define the terms "assignment" and "alienation." Those regulations, which are entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), provide:

> For purposes of this section, the terms "assignment" and "alienation" include --
> (i) Any arrangement providing *for the payment to the employer of plan benefits* which otherwise would be due the participant under the plan, and
> (ii) Any direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires *from a participant or beneficiary* a right or interest enforceable against the plan in, or to, all or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary.

26 C.F.R. § 1.401(a)-13(c)(1) (emphasis added).

---

[10] *See also United States v. Novak*, 441 F.3d 819, 824 (9th Cir.2006) ("In … providing for the enforcement of restitution orders through 18 U.S.C. § 3613, Congress … has created a statutory exception to ERISA's anti-alienation provision."); *U.S. v. First Bank & Trust East Texas,* 588 F.Supp.2d 736, 739 (E.D.Tex. 2007) ("Congress, in enacting the [Mandatory Victim Restitution Act of 1996], made a considered policy decision to create an exception to the general statutory ban on alienation of ERISA-qualified benefits.").

-10-

On its face, Section 206 of ERISA only restricts alienation of "benefits provided under the plan." 29 U.S.C. § 1056(d)(1). When read in conjunction with the coordinate IRC regulations, it is clear that recapturing a fraudulent transfer does not constitute an "assignment" or "alienation" prohibited by ERISA. Subpart (i) requires that the payment be made to an *employer*. The Trustee is not an employer, and subpart (i) is therefore inapplicable. Subpart (ii) requires that an enforceable right be obtained from a *participant or beneficiary*, not from the plan itself. Mr. Hightower contracted with VCR as trustee and on behalf on the Ultima Plan. There is no evidence that Mr. Hightower acted in his capacity as a beneficiary or participant; on the contrary, the Defendants contend that at all times Mr. Hightower acted in his capacity as trustee of the Ultima Plan. *See* Defendants' Memorandum in Support of Motion for Summary Judgment (Docket No. 18). Thus, subpart (ii) is also inapplicable.

Several courts have examined 29 U.S.C. § 1056(d)(1) and the accompanying IRC regulations to determine whether a particular transaction constituted an assignment or alienation within the meaning of ERISA. In *In re Schantz,* 221 B.R. 653 (N.D.N.Y. 1998), for example, the court determined that the anti-alienation provision did not prohibit a trustee from pledging plan assets. The court reasoned that the provision is "restricted to the alienation of the legal right of the beneficiary to receive benefits, a right which is independent of the trustee's ownership of those benefits. The pledging of a trust asset would not alter a beneficiary's legal right to receive benefits…." *Id.* Similarly, the court in *O'Toole v. Arlington Trust Co.*, 681 F.2d 94 (1st Cir.1982) found that a bank, which had used the deposited assets of a trust to offset the trustees' outstanding loans, was not subject to ERISA's anti-alienation provision. The court noted that:

> The prohibition [on alienation] is directed at 'benefits provided,' not the corpus of the fund; and the potential for assignment or alienation, which is limited by the prohibition, would seem to lie with the beneficiary, not the depository. … We would be hard-pressed

to find that § 1056(d) was intended to do more than address the individual beneficiary's right of access to his share of the fund.

*Id.* at 96.[11]  Because the anti-alienation provision only prohibits alienation of benefits to become payable to a plan participant or beneficiary, those provisions do not limit the Trustee's right to recover fraudulent transfers from the corpus of the Ultima Plan.

In addition, the anti-alienation provision, even if otherwise applicable, does not supersede the avoidance provisions of the Bankruptcy Code.  ERISA must be read in harmony with 11 U.S.C. §§ 544 and 548.  *See U.S. v. Wampler,* 624 F.3d 1330, 1336 (10th Cir. 2010) (citing the "familiar principle of statutory construction that, when possible, courts should construe statutes … to foster harmony with other statutory and constitutional law") (internal citations omitted).[12] ERISA explicitly states "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States."  29 U.S.C. § 1144(d).  Thus, ERISA can be read to prohibit the alienation of plan benefits except as otherwise provided for by federal law.

Although only a handful of courts have examined this issue, the majority permitted bankruptcy trustees to use the avoiding powers of 11 U.S.C. §§ 547 and 548 to recover from ERISA plans.  For example, *In re Goldschein*, 241 B.R. 370, 379 (Bankr.D.Md. 1999) held that while "the anti-alienation provision[] protects a beneficiary's interest in legitimate Plan assets from collection .. by creditors," it does "not preclude the avoidance of fraudulent transfers."  In handing down a similar ruling, the court in *In re CF & I Fabricators of Utah Inc.,* 163 B.R. 858, 878 (Bankr.D.Utah 1994) noted that "[t]o rule otherwise would provide a windfall to the …

---

[11] *See also Medical University Hosp. Authority v. Oceana Resorts*, LLC, 2012 WL 683938, *5 (D.S.C. Mar. 2, 2012) ("An arrangement whereby the Plan sets up a default payment structure to provide payments to a medical provider [did] not constitute an assignment [or alienation]" within the meaning of 26 C.F.R. § 1.401(a)-13 or ERISA).
[12] *See also* Sutherland, Statutory Construction, § 51.02 (Sands 4th ed. 1984) ("Statutes for the same subject, although in apparent conflict, are construed to be in harmony if reasonably possible.").

Benefit Plan at the expense of [the debtor's] creditors." *See also Velis v. Kardanis,* 949 F.2d 78, 82 (3rd Cir.1991) (noting that "Congress intended to provide protection against the claims of creditors for a person's interest in pension plans, *unless* vulnerable to challenge as fraudulent conveyances or voidable preferences.") (emphasis added); *In re Key Communications, Inc.*, 994 WL 242643, *1 (5th Cir. 1994) (noting that the appellant cited "no authority for the proposition that pension plans can serve as safe harbors for fraudulent conveyances or voidable transfers").

The Court concludes that the application of the Bankruptcy Code's provisions voiding fraudulent transfers does not conflict with the identified purposes of ERISA's anti-alienation provision. The Bankruptcy Code is directed at the prevention of debtor fraud, while ERISA is aimed at protecting employees "from … [their] own financial improvidence in dealing with third parties." *American Telephone & Telegraph Co. v. Merry*, 592 F.2d 118, 124 (2d Cir.1979). To hold otherwise would subordinate the Bankruptcy Code to ERISA, which contravenes ERISA's express directive that it not be construed to supersede any other federal law. *See* 29 U.S.C. § 1144(d).

The Defendants are therefore not entitled to judgment in their favor on the basis that ERISA's anti-alienation provision prohibits the Trustee from pursuing her fraudulent transfer claims.

### 3. Whether ERISA's exclusive benefit rule bars the Trustee's fraudulent transfer claims

Defendants also contend that the Trustee is prohibited from recovering transfers to the Ultima Plan pursuant to Section 403 of ERISA, 29 U.S.C. § 1103(c)(1), which sets forth the general rule regarding the use of pension plan assets. Known as the "exclusive benefit rule" or the "anti-inurement provision," that section states, in pertinent part:

> Except as provided in paragraph (2), (3), or (4) or subsection (d) of this section, or under sections 1342 and 1344 of this title (relating to termination of insured plans), …the assets

-13-

of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

29 U.S.C. § 1103(c)(1).

The exclusive benefit rule requires a trustee of a retirement plan to hold all assets in trust for the benefit of the employees.  *See generally* 29 U.S.C. § 1103, titled "Establishment of a Trust."[13]  The rule "is intended to protect participants' expected payments by preventing employers from diverting funds to themselves."  *Maez v. Mountain States Tel. and Tel., Inc.,* 54 F.3d 1488, 1506 (10th Cir. 1995).[14]  It also addresses the conditions under which residual assets of an ERISA plan may be retained by an employer or plan sponsor.  *See Outzen v. FDIC ex rel. State Examiner of Banks*, 948 F.2d 1184, 1188 (10th Cir.1991) (discussing whether the exclusive benefit rule prohibited a plan sponsor from retaining surplus funds upon termination of the plan).[15]

By its terms, Section 403 of ERISA relates only to the purposes for which plan assets are held and the fiduciary's conduct in managing those assets.   In *Hughes Aircraft v. Jacobson*, 525 U.S. 432, 441-42, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999), the Supreme Court noted that the exclusive benefit rule "focuses exclusively on whether fund assets were used to pay pension benefits to plan participants ..."  The Supreme Court went on to hold that because the plaintiffs in that case "d[id] not allege that [the trustee] used any of the assets for a purpose other than to pay its obligations to the Plan's beneficiaries, [he] could not have violated the anti-inurement

_____

[13] *See also Johnson v. Couturier*, 572 F.3d 1067, 1076-1077 (9th Cir. 2009) (noting that 29 U.S.C. § 1103 "requires that plan assets be held in trust for the exclusive benefit of plan participants and their beneficiaries").

[14] *See also Hawkeye Nat. Life Ins. Co. v. AVIS Indus. Corp.,* 122 F.3d 490, 497 (8th Cir. 1997) (The exclusive benefit rule "widely proscribes the distribution of plan assets to employers.").

[15] *See also Resolution Trust Corp. v. Financial Institutions Retirement Fund,* 71 F.3d 1553, 1557 (10th Cir. 1995) (finding that a receiver could not retain surplus plan benefits and noting that the exclusive benefit rule is "violated if there has been a removal of plan assets for the benefit of the plan sponsor or anyone other than the plan participants.").

-14-

provision" under § 403(c)." *Id.* More recently, the Supreme Court reiterated that Section 403 of ERISA "demands only that plan assets be held for supplying benefits to plan participants." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 124 S.Ct. 1330, 1344, 158 L.Ed.2d 40 (2004).

The Defendants contend that the exclusive benefit rule defeats any recovery of fraudulent transfers against the Ultima Plan. However, there is a difference between one party's duty to hold assets in trust and another party's ability to reach them. Although Section 503 of ERISA governs the way in which *employers* may utilize plan assets, it does not address the rights of a *third party* to access those assets.[16] The rights of a third party to access plan assets is governed by the anti-alienation provision contained in Section 206 of ERISA, which, as discussed above, does not apply to the Trustee's fraudulent transfer claims. Here, there is no evidence that Mr. Hightower used the assets of the Ultima Plan for any purpose other than providing benefits and defraying reasonable expenses. Whether Mr. Hightower acted appropriately in investing retirement funds in the VCR note program is not at issue in this case. What is at issue – whether the Trustee can recover fraudulent transfers from the Ultima Plan – is not within the scope of Section 403(c)(1) of ERISA.

The Court concludes that the exclusive benefit rule is not applicable to the Trustee's claims. The Defendants are therefore not entitled to judgment in their favor on that basis.

### 4.  Whether the good faith defense under N.M.S.A.1978 § 56-10-22(A) bars the Trustee's fraudulent transfer claims

Next, the Defendants contend that they are entitled to judgment in their favor because they are entitled to the protections of the UFTA, N.M.S.A.1978 § 56-10-22(A). The UFTA

---

[16] *See, e.g., Maez,* 54 F.3d at 1506 (noting that the exclusive benefit rule did not require the return of plan assets where Plaintiffs did not allege any "reversion, diversion, or any other sort of payment of surplus assets to [the plan administrators]").

-15-

provides a safe harbor for transferees who received an otherwise avoidable transfer in good faith

and for a reasonably equivalent value. Section 56-10-22(a) of the UFTA provides:

> A transfer or obligation is not voidable under Paragraph (1) of Subsection A of Section 5
> of the Uniform Fraudulent Transfer Act [N.M.S.A. 1978 § 56-10-18] against a person
> who took in good faith and for a reasonably equivalent value or against any subsequent
> transferee or obligee.

N.M.S.A. 1978 § 56-10-22(A).

The UFTA does not define good faith, nor does the case law applying N.M.S.A. 1978 §

56-10-22(A). However, the language of 11 U.S.C. § 548(c) - the Bankruptcy Code's good faith

provision - is very similar to the UFTA. Section 548(c) of the Bankruptcy Code provides:

> Except to the extent that a transfer or obligation voidable under this section is
> voidable under section 544, 545, or 547 of this title, a transferee or obligee of
> such a transfer or obligation that takes for value and in good faith has a lien on or
> may retain any interest transferred or may enforce any obligation incurred, as the
> case may be, to the extent that such transferee or obligee gave value to the debtor
> in exchange for such transfer or obligation.

11 U.S.C. § 548(c). Under both the UFTA and Section 548(c) of the Bankruptcy Code, the

transferee bears the burden of establishing good faith. *In re Jones,* 184 B.R. 377, 388

(Bankr.D.N.M. 1995) (The [transferees] bear the burden of proof under …[N.M.S.A.1978 § 56-

10-22(A)].”); *In re M & L Business Mach. Co., Inc.*, 84 F.3d 1330, 1338 (10th Cir. 1996)

(“Under § 548(c), [the transferee] has the burden of establishing good faith.”). Further,

considering the similarities between Section 548(c) and the UFTA, “many courts have concluded

that … the same [good faith] analysis applies under both laws.” *In re Tiger Petroleum Co.*, 319

B.R. 225, 232 (Bankr.N.D.Okla.2004).[17] This Court agrees.[18]

---

[17] *See also In re Grandote Country Club Company, Ltd.,* 252 F.3d 1146, 1152 (10th Cir.2001) (noting the
similarities between the Colorado Uniform Fraudulent Transfer Act and 11 U.S.C. § 548); I*n re
Agricultural Research and Technology Group, Inc*., 916 F.2d 528, 535 (9th Cir. 1990) (good faith under
11 U.S.C. § 548(c) is the equivalent of good faith under the Hawaii fraudulent transfer statute); *In re
Spatz*, 222 B.R. 157, 164 (N.D.Ill.1998) (“Because the provisions of the UFTA parallel § 548 of the
Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the

In the Tenth Circuit, "good faith under [11 U.S.C.] § 548(c) should be measured objectively." *M & L Business Mach. Co.,* 84 F.3d 1330, 1338 (10th Cir. 1996). Determining whether a transferee has established good faith under Section 548(c) requires a two-part inquiry: the Court must determine whether the "circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose," and if so, whether "a diligent inquiry would have discovered the fraudulent purpose." *Id.*[19] In applying the "reasonable person" standard, the Court must take into account the transferee's individual circumstances, including their sophistication as an investor and whether they had actual knowledge of the fraud. *See M & L Business Mach. Co, 84 F.3d* at 1338-39 (affirming the bankruptcy court's application of the standard to a "reasonably prudent investor in [the transferee's] position.").[20]

Whether a particular investor is entitled to the protections of the good faith defense is a fact intensive inquiry. This is because "[g]ood faith is not susceptible of precise definition and is determined on a case-by-case basis." *In re Armstrong,* 285 F.3d 1092, 1096 (8th Cir. 2002)

---

UFTA."); *In re First Commercial Management Group, Inc*., 279 B.R. 230, 240 (Bankr.N.D.Ill.2002) (same).

[18] Whether a different analysis would apply when the transferee is not the initial transferee is beyond the scope of this opinion.

[19] *See also In re Bayou Group, LLC,* 439 B.R. 284, 310-312 (S.D.N.Y. 2010), in which the court surveys the case law and concludes:

> The good faith test under Section 548(c) is generally presented as a two-step inquiry. The first question typically posed is whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose. While the cases frequently cite either fraud or insolvency, these two elements are consistently identified as the triggers for inquiry notice. The fraud or insolvency predicate is set forth in countless cases . . . . Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a 'diligent investigation' requirement.

[20] *See also See Cathill v Greemark, LLC (In re World Vision Entertainment Inc.,* 275 B.R. 641. 659 (Bankr. M.D. Md. Fla. 2002) (a transferee with actual knowledge of the fraud cannot establish good faith under Section 548(c)); *In re Bayou Group, LLC.,* 439 B.R. at 314 ("[T]he issue is whether the alleged 'red flag' information would have put a *reasonably prudent institutional hedge fund investor* on inquiry notice.") (emphasis in the original); *Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 23 (S.D.N.Y. 2007) (framing the issue as "whether the information Bear Stearns learned would have caused a *reasonable prime broker in its position* to investigate the matter further") (emphasis added).

(internal citations omitted).[21]  Courts apply certain factors to determine whether a transferee has

established good faith under 11 U.S.C. § 548(c), including: (1) the transferee's state of mind,

including whether he or she had actual or inquiry knowledge of the fraudulent scheme;[22] (2)

whether the investor received exorbitant returns and/or was promised an interest rate greatly

exceeding any standard market rates;[23] (3) how the investor was enticed to make the investment,

including how the investment was marketed;[24] (4) whether the transfers occurred at arm's length,

and more specifically, and how the investor became aware of or affiliated with the debtor;[25] (5)

the individual investor's education and sophistication;[26] (6) the size of the investment;[27] (7) any

prior business dealings between the transferor and transferee, including whether the payment was

late or made by any unusual method;[28] and (8) whether there existed any other red flags that the

investment may not be legitimate.[29]  Many of these factors are relevant to both steps in the two-

---

[21] *See also M & L Business Mach. Co.,* 84 F.3d at 1335 ("Courts have been candid in acknowledging that good faith is not susceptible of precise definition.") (internal quotations omitted); *For Your Ease Only, Inc. v. Calgon Carbon Corp.,* 560 F.3d 717, 721 (7th Cir. 2009) (noting that a precise definition of good faith is hard to come by); In re Roco Corp., 701 F.2d 978, 984 (1st Cir.1983) (same).

[22] *See, e.g., In re Bayou Grp., LLC,* 439 B.R. 284, 314 (S.D.N.Y. 2010) (noting that courts must examine whether investors had knowledge of any red flags that put the investor on inquiry notice).

[23] *See, e.g., In re M & L Bus. Mach. Co., Inc.,* 160 B.R. 851, 859 (Bankr. D.Colo. 1993) (Ponzi-scheme investor did not act in good faith in pursuing a risk-free investment producing profits up to 512 %); I*n re Agricultural Research and Technology Group, Inc.,* 916 F.2d 528, 539 (9th Cir. 1990) (investor did not act in good faith where the value received was grossly in excess of the initial investment).

[24] *See, e.g., In re M &L Business Mach Co., Inc.,* 198 B.R. 800, 810 (D.Colo. 1996) (citing the lack of written financial information or prospectuses of the type normally provided as evidence that the transferee did not act in good faith).

[25] *See, e.g., In re Hannover Corp.,* 310 F.3d 796, 800-801 (5th Cir. 2002) (determining that the good faith defense applied where investors were unaffiliated with the debtor and negotiated an arm's length transaction).

[26] *See, e.g., In re M &L Business Mach Co., Inc.,* 198 B.R. at 810 (affirming bankruptcy court's application of various factors under Section 548(c) including investor's education and experience).

[27] *See, e.g., In re CEP Holdings, Inc.,* 2010 WL 2036949, *6 (Bankr.N.D.Ga. 2010) (rejecting the good faith defense where defendants received extraordinary profits on relatively small investments).

[28] *See, e.g., In re M&L Business Mach. Co., Inc.,* 84 F.3d 1330, 1338 (10th Cir. 1996) (affirming bankruptcy court's finding that the transferee did not act in good faith where the debtor used postdated checks to pay transfers ); *In re Ponzi,* 4 F.2d 25, 29 (1st Cir. 1925) (finding good faith on the part of a bank where Charles Ponzi "had, so far, kept his agreements with the bank").

[29] Subsumed in these factors are such things as the level of risk associated with the investment; market rates of return for investments carrying different levels of risk at the time the investment was made;

part inquiry. Certain factors may be given more or less weight depending on the circumstances. A transferee seeking the protections of the good faith defense need not necessarily present evidence on all applicable factors.

Here, the Defendants contend that Mr. Hightower, the Trustee of the Ultima Plan, was not aware that VCR intended to defraud its creditors. The Defendants argue that Mr. Hightower conducted a reasonable and diligent inquiry into VCR's finances using documents he received after Ultima Homes entered into a construction contract with Mr. Vaughan. They also contend that Mr. Hightower believed VCR was financially stable because it consistently paid its obligations to the Ultima Plan. It is undisputed that: (1) Ultima Homes entered into a contract with Mr. Vaughan to build his personal residence; (2) Mr. Hightower had knowledge regarding Mr. Vaughan's personal finances, including information about loans for which he had been approved; and (3) the Ultima Plan invested $100,000 into the VCR promissory note program. However, these facts are insufficient to establish that the Defendants are entitled the protections of the good faith defense.

Although there is a range of evidence a party may present in support of the good faith defense under the UFTA and 11 U.S.C. § 548(c), here the Defendants proffered very little of it. For example, the Defendants statement of material facts include no facts regarding how VCR's promised interest rate of 16% per annum compared with markets rates of return at the time of investment for investments with comparable or varying levels of risk. It is unclear whether the investment was secured by collateral and if so, how that affected risk. The Defendants provided no evidence regarding Mr. Hightower's level of education, business experience, and financial

whether the transferor's explanation regarding promised rates of return was reasonable; whether the transferee consulted easily obtainable sources of information; whether the transferor provided a prospectus, and if so, what type of information it contained; and whether the transferee asked for financial information to support the decision to make the investment.

literacy, or whether Mr. Hightower considered other investments. The Defendants have not

provided information about how VCR or Mr. Vaughan enticed him to invest in VCR's

promissory note program or how the promissory note program was marketed to Mr. Hightower.

Further, it is unclear what the Defendants learned in connection with any review of any financial

information relating to VCR before investing in the promissory note program, whether they

consulted any other available sources to research VCR's financials, or why Mr. Hightower

ultimately decided to invest.[30] The Defendants have not even proffered the promissory notes in

evidence to establish the terms of the loan or when each loan was made.

The facts established by the Motion for Summary Judgment are insufficient to permit the

Court to conclude that Defendants have satisfied either component of the 2-part inquiry pertinent

to the good faith defense under the UFTA. Because the Defendants failed to establish that they

are entitled to judgment in their favor on the issue of good faith, the Court will not address the

"value" requirement in the good faith defense provision.

### 5. Whether Ultima Homes and Mr. Hightower Are Proper Parties

Finally, the Defendants contend that Mr. Hightower and Ultima Homes are not proper

parties to the suit because they did not receive any transfers from VCR. This argument is

unavailing. The Trustee is asserting claims against Mr. Hightower as trustee of the Ultima Plan,

not in his individual capacity. Consequently, whether Mr. Hightower personally received

transfers from VCR is not relevant.

With respect to Ultima Homes, it is unclear from the evidence presented in connection

with the Motion for Summary Judgment whether that entity received any fraudulent transfers

from VCR. It is undisputed that: (1) Ultima Homes contracted with Mr. Vaughan to build his

---

[30] Although the Defendants reference their reasons for investing throughout their briefs, they did not
include that information in the statement of undisputed facts. The Court therefore did not consider these
assertions as evidence in connection with the Motion for Summary Judgment.

Case 12-01110-j    Doc 47    Filed 05/24/13    Entered 05/24/13 15:32:17 Page 20 of 22

personal residence; and (2) Ultima Homes did not receive funds from VCR in connection with the note program.   Although it does not appear that there was a transfer from VCR to Ultima Homes, the Court needs additional facts to determine whether the Trustee has a valid fraudulent transfer claim against Ultima Homes.  For example, it is unclear from the evidence before the Court whether Ultima Homes received payments for the construction contract from VCR or from Mr. Vaughan.  In addition, the statement of undisputed material facts does not include information about whether VCR received reasonably equivalent value for any payments it made.

The Court therefore denies the Defendants' request to dismiss Ultima Homes and Mr. Hightower, as trustee of the Ultima Plan, from this suit.

## CONCLUSION

Based on the foregoing, the Motion for Summary Judgment will be granted as to Count 1 (turnover) and denied as to all remaining counts.  The Trustee's turnover claim under 11 U.S.C. § 542 will be dismissed.  The Court will enter a separate judgment and order consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge


Date entered on docket:  May 24, 2013

COPY TO:

James Askew & Edward Mazel
Askew & Mazel, LLC
320 Gold Ave S.W.
Suite 300A
Albuquerque, NM 87102

-21-

Maria Weddige-Gurney
The Ahr Law Offices, PC
6707 Academy Road NE, Suite A
Albuquerque, NM 87109